**No. 26-1257**

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————————————

ROBINHOOD DERIVATIVES, LLC,
*Plaintiff-Appellant,*

v.

ANDREA J. CAMPBELL, in her official capacity as Attorney General of Massachusetts; JORDAN MAYNARD, in his official capacity as Chair of the Massachusetts Gaming Commission; EILEEN O'BRIEN, in her official capacity as Commissioner of the Massachusetts Gaming Commission; BRADFORD R. HILL, in his official capacity as Commissioner of the Massachusetts Gaming Commission; NAKISHA SKINNER, in her official capacity as Commissioner of the Massachusetts Gaming Commission; and PAUL BRODEUR, in his official capacity as Commissioner of the Massachusetts Gaming Commission,
*Defendants-Appellees.*

———————————————

Appeal from the U.S. District Court for the District of Massachusetts

———————————————

## APPELLEES' BRIEF

———————————————

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
M. PATRICK MOORE
  *First Assistant Attorney General*
LOUISA CASTRUCCI
GERARD J. CEDRONE
ALDA CHAN
FRANCES COHEN
JOSHUA R. EDLIN
JARED RINEHIMER
  *Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

July 20, 2026

## TABLE OF CONTENTS

Introduction ...................................................................................... 1

Statement of the Issues ................................................................... 2

Statement of the Case ..................................................................... 2

    I.   Legal Background ................................................................... 2

    II.  Factual Background ............................................................... 4

        A. Kalshi ............................................................................... 4

        B. Robinhood ........................................................................ 7

    III. Procedural History ............................................................... 8

        A. Robinhood's Initial Complaint ....................................... 8

        B. Robinhood's Amended Complaint ................................ 10

Summary of the Argument ............................................................ 12

Argument ........................................................................................ 14

    I.   The district court correctly dismissed Robinhood's claim on ripeness grounds ................................................................. 14

        A. Robinhood's fear that the Commonwealth will sue it for facilitating Kalshi-related transactions rests on contingent future events. ................................................. 15

            1.  Robinhood's claim is not fit for judicial decision .............. 15

            2.  Withholding adjudication imposes no cognizable hardship on Robinhood. ..................................................... 21

            3.  Robinhood's remaining arguments are unpersuasive. ..... 23

        B. Robinhood's unsubstantiated Rothera plans do not make its claim ripe ................................................................... 26

    II.  In the alternative, the sole claim that Robinhood asserts in this action fails as a matter of law ................................... 31

Conclusion ...................................................................................... 35

i

# TABLE OF AUTHORITIES

**Cases:**

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015)........................................................... 14, 31, 32

*Aroostook Band of Micmacs v. Ryan,*
404 F.3d 48 (1st Cir. 2005) ...............................................33

*Children's Healthcare Is a Legal Duty, Inc. v. Deters,*
92 F.3d 1412 (6th Cir. 1996)..............................................33

*Colonial Penn Grp., Inc. v. Colonial Deposit Co.,*
834 F.2d 229 (1st Cir. 1987) ..............................................34

*Commonwealth v. KalshiEX LLC,*
No. 2584CV02525, 2026 Mass. Super. LEXIS 2 (Jan. 20, 2026).......5, 6

*Ex parte Young,*
209 U.S. 123 (1908)........................................................ 14, 32, 33, 34

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
953 F.3d 154 (1st Cir. 2020) ......................................... 14, 31

*KalshiEX LLC v. Flaherty,*
172 F.4th 220 (3d Cir. 2026)................................................7

*KalshiEX LLC v. Hendrick,*
817 F. Supp. 3d 1014 (D. Nev. 2025).....................................7

*KalshiEX LLC v. Johnson,*
No. 26-cv-1715, 2026 WL 1223373 (D. Ariz. May 5, 2026) ...................7

*KalshiEX LLC v. Martin,*
793 F. Supp. 3d 667 (D. Md. 2025).......................................7

*KalshiEX LLC v. Orgel,*
No. 3:26-cv-34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ..............7

*KalshiEX LLC v. Schuler,*
No. 2:25-cv-1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026) ..............7

*Kalshiex LLC v. Schuler,*
No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026)......................7

*KalshiEX LLC v. Williams,*
No. 25-cv-8846, 2026 WL 2017466 (S.D.N.Y. July 13, 2026)................7

*Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey,*
844 F.3d 318 (1st Cir. 2016) ............................................. 12, 13, 15, 16,
........................................................................ 17, 21, 22, 23, 25

*Mangual v. Rotger-Sabat,*
317 F.3d 45 (1st Cir. 2003) ........................................................20

*Mi Familia Vota v. Ogg,*
105 F.4th 313 (5th Cir. 2024) .........................................................33, 34

*Minn. RFL Republican Farmer Labor Caucus v. Freeman,*
33 F.4th 985 (8th Cir. 2022) ..........................................................33, 34

*Murphy v. NCAA,*
584 U.S. 453 (2018)...................................................................3

*N.H. Lottery Comm'n v. Rosen,*
986 F.3d 38 (1st Cir. 2021) .......................................................22, 23, 24

*Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,*
840 F.2d 985 (1st Cir. 1988) ........................................................30

*Public Serv. Comm'n of Utah v. Wycoff Co., Inc.,*
344 U.S. 237 (1952)...................................................................34

*R.I. Ass'n of Realtors, Inc. v. Whitehouse,*
199 F.3d 26 (1st Cir. 1999) .......................................................20, 29

*Reddy v. Foster,*
845 F.3d 493 (1st Cir. 2017) ...................................... 15, 19, 24, 26, 28

*Skelly Oil Co. v. Phillips Petroleum Co.,*
339 U.S. 667 (1950)...................................................................34

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014)...................................................................20

*Texas v. United States,*
523 U.S. 296 (1998)..........................................................2, 15, 17, 21

*United States v. Zannino,*
895 F.2d 1 (1st Cir. 1990) ..........................................................30

**Statutes:**

7 U.S.C. §2(a)(1)(A) ............................................................... 5, 6

18 U.S.C. §1084 .......................................................................... 2

28 U.S.C.:

  §3702 .......................................................................................... 3

  §3704(a) ...................................................................................... 3

Mass. G.L. c. 23N:

  §5 ................................................................................................ 4

  §6(d) ........................................................................................... 4

  §6(f) ............................................................................................ 4

  §13(d)(i) ..................................................................................... 4

**Other Authorities:**

Am. Gaming Ass'n, State of the States 2025 (May
  2025), https://perma.cc/J27S-WLSB ...................................... 3

John T. Holden et al., Legalized Sports Wagering in
  America, 44 Cardozo L. Rev. 1383 (2023) ............................. 2

## INTRODUCTION

Plaintiff Robinhood Markets, LLC, operates a platform that allows users to buy and sell sports-related "event contracts" offered by the prediction market Kalshi. As the Commonwealth has explained in pending state-court litigation, Kalshi's operations in Massachusetts violate the Massachusetts Sports Wagering Act. But the Commonwealth has never enforced—or even *threatened* to enforce—that statute against Robinhood.

For that reason, the district court correctly dismissed this lawsuit as unripe. Robinhood's sole claim depends on its fear that the Commonwealth will someday file an enforcement suit against it. As the district court recognized, however, that fear is entirely speculative. For one thing, the Commonwealth has stipulated that it will not take any legal action against Robinhood until after the state courts resolve the Commonwealth's motion for a preliminary injunction against Kalshi. And even after that point, the likelihood that Robinhood will ever face an enforcement action depends on both the outcome of the Kalshi state-court proceedings and future prosecutorial decisions that Robinhood has not shown the Commonwealth is likely to make.

Facing these headwinds, Robinhood pivots from its Kalshi-related offerings to its parent company's stated plans to offer products through a different marketplace, Rothera. On this record, however, Robinhood's

Rothera-related arguments are even thinner and more speculative than its Kalshi-related ones. To prevail, Robinhood must refute the conclusion that its claim depends on "contingent future events that may not occur." *Texas v. United States*, 523 U.S. 296, 300 (1998). It has failed to carry that burden, and this Court should affirm the judgment below.

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly dismissed Robinhood's claim as unripe.

2.    Whether, in the alternative, this Court should affirm the judgment below because Robinhood's sole claim fails as a matter of law.

## STATEMENT OF THE CASE

### I.    Legal Background

The regulation of sports wagering is among a state's historic police powers, and states have long exercised that power to control whether, and to what extent, sports betting takes place within their borders. *See* John T. Holden et al., *Legalized Sports Wagering in America*, 44 Cardozo L. Rev. 1383, 1390-1392 (2023). Federal law, for its part, has traditionally played a supporting role in this field. For example, Congress has enacted several statutes that complement state sports-wagering laws by criminalizing interstate efforts to circumvent them. *E.g.*, 18 U.S.C. §1084 (barring any person engaged "in the business of betting or

2

wagering" from electronically transmitting "bets or wagers on any sporting event or contest" across state lines, unless such betting is legal in the jurisdictions where the transmission is sent and received).

Congress attempted to alter this federal-state balance in 1992 by prohibiting any state that did not already permit sports wagering from "authoriz[ing]" wagering on amateur or professional sports. 28 U.S.C. §3702; *see id.* §3704(a). But in 2018, the Supreme Court struck down that law under the Tenth Amendment. *See Murphy v. NCAA*, 584 U.S. 453, 474 (2018). In doing so, the Court left the door open to future congressional action within certain parameters. *See id.* at 486, 474. In the absence of such direct congressional action, however, the Court emphasized that "each State is free to act on its own." *Id.* at 486.

Since *Murphy*, more than three dozen jurisdictions have recalibrated their approach to sports wagering, moving from a policy of prohibition to a policy of legalization and oversight. Am. Gaming Ass'n, *State of the States 2025*, at 12-13 (May 2025), https://perma.cc/J27S-WLSB. In Massachusetts, for example, the Sports Wagering Act establishes a framework for lawful sports betting regulated by the Massachusetts Gaming Commission (MGC). *See* Mass. G.L. c. 23N, §1 *et seq.* Under the Act, an entity must undergo a rigorous investigation, secure a license, and pay various fees and assessments before offering sports wagers in

the Commonwealth. *See id.* §§5, 6(d), 6(f). Once it begins operating, a licensed entity must also comply with various limitations and safeguards, such as a bar on accepting wagers from people under 21. *Id.* §13(d)(i).

## II.    Factual Background

### A.    Kalshi

1.    In January 2025, KalshiEX LLC began offering sports bets in Massachusetts through its website and app. J.A. 111, 121. Kalshi calls these products "event contracts," but they fall squarely within the scope of the Massachusetts Sports Wagering Act—allowing users to bet on, for example, whether the Patriots will win their season opener or whether anyone will pitch a no-hitter this MLB season. J.A. 114, 121-122. Kalshi does not have a license from the MGC to offer these products. J.A. 110. Nor does Kalshi follow the Sports Wagering Act's various requirements, limitations, and safeguards. J.A. 137-138.

2.    In September 2025, the Commonwealth brought a civil enforcement action against Kalshi in Massachusetts state court, seeking declaratory, monetary, and injunctive relief. J.A. 110-143. The Commonwealth also moved for a preliminary injunction to bar Kalshi's continued unlicensed operations. J.A. 145-149. In opposing that motion, Kalshi did not dispute its failure to comply with the Sports Wagering Act. *Commonwealth v. KalshiEX LLC*, No. 2584CV02525, 2026 Mass. Super.

4

LEXIS 2, at *9-10 (Jan. 20, 2026). Instead, Kalshi rested on the affirmative defense that, because it operates a federally registered "designated contract market" (DCM), the Commodity Exchange Act (CEA) preempts any state gaming laws that otherwise apply to it. *See id.* Kalshi relied in particular on 7 U.S.C. §2(a)(1)(A), which grants the federal Commodity Futures Trading Commission (CFTC) "exclusive jurisdiction" over "transactions involving swaps" that are "traded or executed" on DCMs. *See* Kalshi Mem. of Law at 12-13, *KalshiEX*, No. 2584CV02525, Paper No. 41 (Nov. 18, 2025).

As the Commonwealth explained, however, the CEA does not immunize Kalshi's conduct. As an initial matter, Kalshi's sports-related offerings are not "swaps" as that term is used in §2(a)(1)(A). *See* Comm. Combined Opp./Reply at 6-7, *KalshiEX*, No. 2584CV02525, Paper No. 44 (Dec. 3, 2025). Kalshi offers standard-issue sports bets—not the sophisticated financial products that the CEA regulates. And even if Kalshi's sports bets could be recharacterized as "swaps," §2(a)(1)(A) does not expressly preempt state law—let alone displace, in clear terms, a state's traditional power to regulate sports betting. *See id.* at 5-8. Nor does the CEA impliedly displace state law: the statute expressly contemplates a role for state regulation, and it is possible to comply with both the CEA and the Massachusetts Sports Wagering Act. *See id.* at 16-19.

3.    The superior court rejected Kalshi's preemption arguments and granted the Commonwealth's motion for a preliminary injunction. The court "assume[d] without deciding that Kalshi's event contracts are swaps." *KalshiEX LLC*, 2026 Mass. Super. LEXIS 2, at *13. Nevertheless, the court reasoned that, even if §2(a)(1)(A) "evidences an intent to preempt *some* state law," its preemptive reach does not "extend[] as far as state gaming laws." *Id.* That conclusion, the court explained, followed from the statutory text, the broader structure and history of "the CEA as a whole," and "the traditional balance between state and federal regulation of gaming." *Id.* at *13-18. The court also rejected any argument that the CEA conflicts with—and therefore impliedly preempts—state sports-wagering law. *Id.* at *18-20.

Kalshi appealed the superior court's order. A single justice of the Massachusetts Appeals Court stayed the preliminary injunction pending appeal "[w]ithout suggesting any view on the merits or the disposition of the litigation." *Commonwealth v. KalshiEX LLC*, No. 2026-J-143 (Feb. 17, 2026). The matter was argued before the Massachusetts Supreme Judicial Court on May 4, 2026, and remains pending. *See Commonwealth v. KalshiEX LLC*, No. SJC-13906.

4.    The Commonwealth's suit against Kalshi is not the only litigation between Kalshi and state regulators. Several other states have

6

initiated enforcement proceedings against Kalshi, while Kalshi, in turn, has filed pre-enforcement lawsuits seeking to enjoin several states from carrying out their laws. As of the date of this brief, the Third Circuit and a minority of trial courts that have confronted the issue have concluded that Kalshi is likely to prevail in its preemption arguments.[1] Meanwhile, the Sixth Circuit and a majority of trial courts that have confronted the issue have concluded that Kalshi is unlikely to succeed in escaping states' traditional power to regulate sports wagering.[2]

## B.    Robinhood

According to its complaint, Robinhood operates a platform through which users can "access" Kalshi's sports-related offerings. J.A. 2 (¶ 1). In other words, Robinhood alleges that it acts as an "intermedia[ry]"—*i.e.*, a conduit through which users can purchase sports wagers that actually trade on Kalshi's DCM. J.A. 3, 7, 13, 22 (¶¶ 5, 23, 37, 57).

---

[1] *KalshiEX LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026); *KalshiEX LLC v. Orgel*, No. 3:26-cv-34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026); *KalshiEX LLC v. Johnson*, No. 26-cv-1715, 2026 WL 1223373 (D. Ariz. May 5, 2026).

[2] *Kalshiex LLC v. Schuler*, No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026) (*per curiam*); *KalshiEX LLC v. Williams*, No. 25-cv-8846, 2026 WL 2017466 (S.D.N.Y. July 13, 2026); *KalshiEX LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026); *KalshiEX LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025).

Robinhood does not allege that the Commonwealth[3] has ever taken action against it for serving as an intermediary for Kalshi's sports wagers. *See* J.A. 1-27. Nor does Robinhood allege that the Commonwealth has even *threatened* to take action against it for its connection to Kalshi. *See id.* Indeed, Robinhood's complaint fails to allege any interactions *at all* between Robinhood and an agency or official of the Commonwealth. *See id.*; *cf., e.g.*, J.A. 129 (¶ 108) (discussing the cease-and-desist letters that Kalshi received from state regulators).

## III.    Procedural History

### A.    Robinhood's Initial Complaint

The business day after the Commonwealth sued Kalshi in state court (*see supra*, at 4), Robinhood filed this pre-enforcement action. *See* J.A. 1-27. Citing the Commonwealth's lawsuit against Kalshi and the fact that "Robinhood intermediates its customers' event contract trades, including sports-related event contract trades, on Kalshi's exchange," Robinhood claimed that there was "a real and imminent threat that Massachusetts [would] file a similar complaint and motion against Robinhood." J.A. 3 (¶ 5). The complaint's single count invoked the "Supremacy Clause," J.A. 25-26, and the prayer for relief sought declaratory and

---

[3]    For ease of discussion, this brief refers to the defendants—the Massachusetts Attorney General and the MGC's commissioners—collectively as "the Commonwealth."

injunctive relief, J.A. 26-27.  Later that same week, Robinhood moved for a preliminary injunction.  *See* D. Mass. Dkt. No. 10.

To clarify its intentions, the Commonwealth filed a "Stipulation of Non-Enforcement," in which it committed that:

> The Commonwealth [would] not initiate or maintain any civil or criminal enforcement action against Robinhood based on Robinhood's facilitation of Massachusetts customers' orders in sports-related event contracts listed and executed on Kalshi's designated contract market until after . . . a court reaches a decision on the pending motion for preliminary injunction in the [state-court] Kalshi enforcement proceedings . . . .

J.A. 30 (¶ 4).  The Commonwealth subsequently opposed Robinhood's motion for a preliminary injunction and filed a cross-motion to dismiss the action.  *See* D. Mass. Dkt. Nos. 36-37.

The district court (Stearns, J.) denied Robinhood's motion and granted the Commonwealth's motion, holding that Robinhood had not demonstrated that its claim was ripe for judicial review.  Appellants' Br. Addendum 1-5 (Add.).  In light of the Commonwealth's stipulation, the court explained, there was "no risk that the Commonwealth w[ould] engage in the conduct which Robinhood allege[d] to be unlawful prior to a decision being issued by [the] state court [in the Kalshi litigation]."  *Id.* "Whether there [was] a risk that the Commonwealth w[ould] engage in that conduct *after* the state court rule[d]," the court went on, "depend[ed] entirely on what that decision proves to be."  *Id.*  The Court also held that

9

Robinhood had "not shown that it w[ould] suffer any hardship if adjudication of its claim [was] delayed until it ripens." Add. 5.

## B.    Robinhood's Amended Complaint

Approximately three weeks after the district court's order, Robinhood moved for reconsideration, arguing that two pieces of "new evidence" showed that its claim had since ripened. D. Mass. Dkt. No. 74, at 15-19. First, Robinhood argued that—one day before the district court's dismissal order—it had "launched trading of certain sports-related event contracts on ForecastEx LLC's . . . DCM." J.A. 62 (¶ 6). According to Robinhood, "[t]his [was] the first time Robinhood ha[d] used a DCM other than Kalshi to execute trades in sports-related event contracts." *Id.* Second, Robinhood argued that, several days before the district court's dismissal order, the MGC had sent a letter to licensed sports-wagering operators cautioning them about their legal obligations vis-à-vis "sports-related event contracts." J.A. 67.

The district court granted reconsideration. J.A. 69. The court's minute order read, in relevant part:

> Robinhood submits evidence that it has now contracted with a second DCM (ForecastEx). Because the court's [Dismissal] Order was premised on Robinhood offering sports wagering only through the Kalshi DCM, the court agrees that reconsideration is warranted. The court accordingly will reopen this case and allow Robinhood . . . to amend its complaint to reflect changed circumstances.

10

*Id.*

Robinhood subsequently filed an amended complaint, *see* J.A. 70-149, and a renewed motion for a preliminary injunction, *see* D. Mass. Dkt. No. 89. The Commonwealth opposed the Robinhood's motion and again cross-moved to dismiss. *See* D. Mass. Dkt. Nos. 101-102. The Commonwealth also filed an "Amended Stipulation of Non-Enforcement," which expanded upon the Commonwealth's prior stipulation in two relevant respects. J.A. 150-155. First, under the amended stipulation, the Commonwealth extended its nonenforcement commitment to "Robinhood's offering of sports-related event contracts listed and executed on Forecast-Ex's designated contract market." J.A. 152 (¶ 7). Second, the amended stipulation provided that—subject to one caveat discussed below (*see infra*, at 16, n.4)—the nonenforcement commitment will remain in place during the pendency of any appeal in the Kalshi state-court preliminary-injunction proceedings. *Id.*

Just a few weeks later, Robinhood admitted in a declaration that "ForecastEx [had] ceased offering sports-related event contract trading," and that "Robinhood therefore no longer offer[ed] sports-related event contract trading on ForecastEx's DCM." J.A. 162 (¶ 4). Seeking a new hook for its claim, Robinhood asserted for the first time that its parent company (Robinhood Markets, Inc., which is not a party to this litigation)

11

had purchased a roughly 45% stake in a DCM called "Rothera." *Id.* (¶ 6). Although Robinhood Markets had consummated that transaction before Robinhood filed its amended complaint, the amended complaint made no reference to the transaction and in no way suggested it had any bearing on this litigation. Nevertheless, Robinhood's new declaration maintained that Robinhood "plan[ned] to offer sports-related event contracts through Rothera's DCM . . . by June 2026." *Id.* (¶¶ 7-8). The declaration provided no further details about, or evidence to substantiate, such plans.

The court again denied Robinhood's motion and dismissed the case. In its minute order, the court wrote:

> The court only reopened this matter because Robinhood began offering sports-related event contracts through ForecastEx. Robinhood now represents that it has stopped offering sports-related event contracts through ForecastEx. The case is accordingly dismissed for the same reasons previously discussed in [the first Dismissal] Order.

Add. 6.

## SUMMARY OF THE ARGUMENT

I.    The district court correctly dismissed Robinhood's claim on ripeness grounds. A claim is ripe only if (1) it is "fit for judicial decision" and (2) withholding adjudication would cause the plaintiff to "suffer hardship." *Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016). Robinhood's claim does not satisfy either prong.

Robinhood argues that its claim is ripe because it is at risk of being

sued by the Commonwealth for facilitating trades on Kalshi's DCM. But the risk of any such enforcement suit "rests upon contingent future events that may not occur." *Id.* at 326 (quotation marks omitted). In light of the Commonwealth's stipulation, there is no present threat of legal action against Robinhood for its Kalshi-related conduct. And even after that stipulation expires, the risk of an enforcement suit turns upon contingencies like the outcome of the pending state-court proceedings against Kalshi and the Commonwealth's future prosecutorial decisions. Thus, Robinhood has not shown that its pre-enforcement suit is fit for resolution, or that it will suffer any harm from awaiting adjudication.

Robinhood argues in the alternative that its claim is ripe because it plans to offer contracts through Rothera, an exchange in which its parent company holds a minority interest. But the vague information that Robinhood has provided about its Rothera-related activities does not come close to establishing that it has a "concrete plan to engage immediately (or nearly so) in an arguably proscribed activity." Appellant's Br. 38 (brackets and quotation marks omitted). For all these reasons, the district court's ripeness determination was correct, and this Court should affirm the judgment below. And even if the Court were to conclude that developments postdating the judgment raise new questions about ripeness, the most Robinhood would be entitled to is a remand for resolution

13

of the ripeness question in light of those new developments. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 953 F.3d 154, 158 (1st Cir. 2020).

II.    Even if the Court were to deem Robinhood's claim ripe, it should still affirm the district court's dismissal. Robinhood's single-count complaint does not invoke any recognized cause of action; instead, Robinhood purported to sue directly under the Supremacy Clause. *See* J.A. 25-26, 96-98. But controlling precedent is clear: the Supremacy Clause "is not the source of any federal rights," and it "certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-325 (2015) (quotation marks omitted). To get around this problem, Robinhood recharacterizes its claim as an action under *Ex parte Young*, 209 U.S. 123 (1908). But *Young* applies only when "officers of the state . . . *threaten and are about to* commence proceedings [against the plaintiff]." 209 U.S. at 156 (emphasis added). Again, Robinhood can point to no facts to suggest that the Commonwealth "threaten[ed] and [was] about to commence proceedings" against it. For that reason, too, the judgment below is correct.

## ARGUMENT

### I.    The district court correctly dismissed Robinhood's claim on ripeness grounds.

Ripeness doctrine enforces Article III's most basic command: federal courts review actual controversies, not "contingent future events

14

that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). Robinhood argues that its claim is ripe because it serves as an intermediary for sports-related event contracts that trade on Kalshi's DCM. As a fallback, Robinhood points to speculative future plans involving another DCM. But neither set of activities gives rise to a ripe controversy. The district court's ripeness analysis was correct when the court first dismissed the case; it remained correct when the court dismissed the amended complaint; and Robinhood has not demonstrated any material factual change since then.

### A. Robinhood's fear that the Commonwealth will sue it for facilitating Kalshi-related transactions rests on contingent future events.

The crux of Robinhood's ripeness argument is that it facilitates trades on Kalshi's DCM. But a pre-enforcement suit based on that conduct is ripe only if (1) the claim is "fit for judicial decision" and (2) withholding adjudication would cause "hardship" to Robinhood. *Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016). Robinhood, the party invoking federal jurisdiction, bears the burden on both prongs. *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017). It carries neither.

### 1. Robinhood's claim is not fit for judicial decision.

The fitness prong of the ripeness test asks whether Robinhood's

15

claim "rests upon contingent future events that may not occur." *Healey*, 844 F.3d at 326. That description squarely covers Robinhood's feared injury.

a. As the record makes clear, there is no present threat of enforcement against Robinhood for its Kalshi-related conduct. The Commonwealth has twice stipulated, formally and on the docket, that it will not bring any civil or criminal enforcement action against Robinhood based on Robinhood's intermediation of sports-related event contracts on Kalshi's DCM until the resolution of certain state-court proceedings against Kalshi. J.A. 30 (¶ 4); J.A. 152 (¶ 7). Robinhood does not dispute that the operative stipulation covers *all* of its Kalshi-related conduct. So whatever else may be said, no enforcement action arising out of that conduct can be brought while the stipulation remains in effect.[4]

Even after that period expires, the enforcement action that Robinhood fears "may not occur as anticipated, or indeed may not occur at all."

---

[4] The stipulation contains one caveat: if the pertinent state-court proceedings are not resolved by August 2027, the Commonwealth may withdraw the stipulation on 30 days' notice. J.A. 153 (¶ 8). But that backstop does not convert the stipulations into an *immediate* threat; instead, it simply ensures that the stipulation does not become a device for indefinite delay. In any event, given that the Supreme Judicial Court heard oral argument on the relevant state-court proceedings on May 4, 2026, it is almost certain that the relevant state-court proceedings will conclude before the August 2027 deadline.

16

*Texas*, 523 U.S. at 300. If the Commonwealth prevails in the co-pending state-court proceedings against Kalshi, and Kalshi is thus enjoined from offering sports-related event contracts in Massachusetts, Robinhood "c[an]not use KalshiEX as its DCM." Appellant's Br. 38. In other words, there will be no ongoing conduct against which to enforce state law. Add. 4. If, by contrast, the Commonwealth does not prevail against Kalshi (the marketplace on which sports-related event contracts are actually traded), there is nothing in the record to suggest that the Commonwealth would open a second litigation front against Robinhood (a third-party intermediary that links to Kalshi's marketplace). Robinhood counters (Br. 39) that a ruling in Kalshi's favor on the preliminary injunction would not "finally resolve the underlying merits." But finality is not the test; the question is whether, "under all the circumstances," there is a controversy of "sufficient immediacy and reality." *Healey*, 844 F.3d at 326. As the district court explained, if Kalshi prevails in the preliminary-injunction dispute, enforcement against Robinhood is "unlikely." Add. 4.

Even that account understates speculative nature of Robinhood's contemplated injury, because bringing an enforcement action against Robinhood at some unknown point in the future would require a further, independent exercise of prosecutorial discretion. Robinhood offers no reason to believe the Commonwealth would exercise its discretion in that

17

way.  The Commonwealth has never sued Robinhood in connection with sports-related event contracts.  *See supra*, at 8.  It has never threatened to sue Robinhood for its intermediation of sports-related event contracts.  *See id.*  It has not sent Robinhood any cease-and-desist letters.  *See id.*  Indeed, until Robinhood filed its complaint, the Commonwealth had no interactions with Robinhood about the subject matter of this lawsuit at all.  *See id.*

b.    To support its purported fear of "an immediate, concrete threat of enforcement," Robinhood principally points (Br. 15) to a passing reference to Robinhood in the Commonwealth's state-court complaint against Kalshi.  The relevant passage is worth quoting in full.  It states:

> The availability of Kalshi's contracts are not limited to Kalshi's platform, but are also available on Robinhood, a stock-trading platform accessible via app and webpage.  The two platforms have partnered since March of 2025 to offer Kalshi wagers.
>
> Approximately $1 billion worth of Kalshi wagers were traded on Robinhood during the second quarter of the year, which likely generated an estimated $10 million in revenue for Kalshi.

J.A. 137 (paragraph numbers omitted).  That mundane factual description of trading volumes on Robinhood's platform cannot reasonably be understood as a threat of litigation against Robinhood.  If anything, the Commonwealth's decision to describe Robinhood's role as an intermediary and nonetheless sue only Kalshi confirms that any enforcement

18

against Robinhood remains a choice not yet made, and one the Commonwealth has now twice stipulated to defer.

The other communications that Robinhood cites fail to show ripeness for largely the same reasons. For example, Robinhood points (Br. 18) to an advisory letter that the MGC issued to MGC-licensed sportsbooks, in which the commission warned that licensees engaging in certain conduct could face penalties "up to and including revocation of [their] license." J.A. 67. But that advisory means nothing for Robinhood, which is not a licensed sportsbook. *See* J.A. 94 (¶64). Equally inapposite is Robinhood's reliance (Br. 19-20) on two letters that the MGC sent to one of its vendors seeking information about the vendor's relationships with firms that "offer Predictions Markets or Event Contracts." J.A. 160; *see* J.A. 156-157 (¶¶4-5). Those letters merely sought information; Robinhood does not explain how they conveyed a threat of legal action against anyone, let alone Robinhood.

c.    Case law confirms that Robinhood's claim is not ripe. In particular, this case sits comfortably within *Reddy*. There, the plaintiffs challenged a statute that would restrict their conduct only if and when a health care facility demarcated a buffer zone; because no zone yet existed, and "the possible establishment and contours of such a future zone [were] highly uncertain," the claim was unripe. 845 F.3d at 505. So too here:

19

the enforcement threat Robinhood fears depends on antecedent events that have not occurred and whose shape no one can predict. *See supra*, at 16-18. Like a claim that is contingent on whether a zone is ever drawn, a claim that is contingent on "what [a state-court] decision proves to be," Add. 4, is not ripe.

The cases on which Robinhood relies involve threats with no comparable contingency. In *Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26 (1st Cir. 1999), a trade association challenged a state law that barred the association from using public records to recruit new members. The court found the claim ripe in part because the attorney general "ha[d] never disclaimed" the statute's application. *Id.* at 28. Here, by contrast, the Commonwealth has stipulated that it will not bring an enforcement action during the pendency of the Kalshi state-court proceedings. In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), an enforcement proceeding had already been initiated against the plaintiff itself before a state commission; the Court treated that history of "past enforcement against the same conduct" as "good evidence" that the threat of enforcement was real. *Id.* at 164. Here, by contrast, no proceedings have ever been instituted against Robinhood. And in *Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003), the challenged criminal-libel statute had recently been enforced against another reporter at the same

20

newspaper as the plaintiff, and a local police official had stated that he was "prepared . . . to file . . . criminal charges" against the plaintiff. *Id.* at 53-54. Robinhood's factual situation is meaningfully different. The Court in *Mangual* also applied an "extremely low" standard that governs standing and ripeness in the First Amendment context, *id.* at 57; *see id.* at 60, which has no bearing here.

d.　Robinhood's argument that its preemption theory is "purely legal" and requires no factual development (Br. 31-32) sidesteps the relevant fitness issue. The purely legal character of a question bears on the prudential fitness, but it cannot supply the constitutional minimum of a sufficiently immediate controversy. In *Texas*, for example, the Court held that the plaintiff's claim was not fit for resolution even though the core issue was a question of statutory interpretation. *See* 523 U.S at 301. ("The operation of the statute is better grasped when viewed in light of a particular application."). An abstract legal question attached to a contingent injury is still abstract.

### 2.　Withholding adjudication imposes no cognizable hardship on Robinhood.

The hardship prong focuses on "the harm to the [plaintiff] that would come" if the court were to "withhold[] . . . a decision" on the plaintiff's claim. *Healey*, 844 F.3d at 330. "Here, too, the analysis focuses on direct and immediate harm." *Id.* (quotation marks omitted). And where,

21

as here, the plaintiff's claim is not fit for resolution because the alleged injury is "contingent on the details of future [events] that are not known," the fitness analysis can "also dictate[] the outcome as to the [hardship] prong." *Id.* In those circumstances, "the harm to the [plaintiff] from any delay in having their case adjudicated is necessarily also contingent." *Id.*

That principle resolves the hardship analysis in this case. As just described, Robinhood faces no present threat of an enforcement action in light of the Commonwealth's stipulation. *See supra*, at 16. And even after the stipulation expires, the likelihood of an enforcement action is speculative at best. *See supra*, at 16-18. Against that backdrop, Robinhood does not suffer any cognizable hardship from the district court's decision to withhold adjudication.

Robinhood's attempted analogy to *New Hampshire Lottery Commission v. Rosen*, 986 F.3d 38 (1st Cir. 2021), is misplaced. Comparing itself to the plaintiff in that case, Robinhood argues (Br. 34) that it will be forced to "operate under a dangling sword of indictment" if it cannot pursue its claim now. But the facts of *New Hampshire Lottery* underscore why Robinhood's claim is not ripe. There, the U.S. Department of Justice issued an official opinion stating that the Wire Act does not bar states from selling lottery tickets online, before subsequently changing its position and formally declaring that the Wire Act *does* make it illegal for

22

states to "sell[] lottery tickets via the Internet." *Id.* at 45-46. In announcing its revised position, DOJ temporarily stayed its hand, "giv[ing] businesses that relied on the [earlier DOJ] opinion time to bring their operations into compliance with federal law." *Id.* In other words, the federal government had clearly decided how it thought the Wire Act applied to the plaintiff (the New Hampshire state lottery) and was merely delaying enforcement to give the lottery time to comply with the new rules. Here, by contrast, Robinhood points to no evidence that the Commonwealth has made any determinations about Robinhood's Kalshi-related activities, and the parties are awaiting a state-court decision that will bear on those determinations in any event. *See supra*, at 16-18.

Nor does the prospect of eventual penalties or reputational harm supply the necessary hardship. Those harms would flow from an enforcement action. The action is contingent—thus, so are the harms. *See Healey*, 844 F.3d at 330. Moreover, the district court dismissed without prejudice, Add. 5, so if the contingencies ever resolve into a genuine threat (for example, if the stipulations expire and the facts on the ground change such that an enforcement action against Robinhood becomes likely), the federal courthouse door stands open.

### 3.    Robinhood's remaining arguments are unpersuasive.

In addition to the arguments already discussed, Robinhood levies

23

three principal attacks on the district court's reasoning. None undermines the court's ripeness determination.

*First*, Robinhood argues (Br. 34-37) that the Commonwealth's "temporary forbearance" cannot defeat ripeness; citing *New Hampshire Lottery*, Robinhood argues that an "unambiguous disclaimer of coverage" is instead required. As already discussed, however, the Commonwealth's stipulations are more like the disclaimer in *Reddy* than the temporary forbearance in *New Hampshire Lottery*. *See supra*, at 19-20, 22-23. In *New Hampshire Lottery*, the federal government had formally declared that the plaintiff's conduct violated the Wire Act; DOJ offered a unilateral, temporary grace period only to give parties time "to bring their operations into compliance" with DOJ's new interpretation. 986 F.3d at 46-47, 52-53. Here, the nonenforcement stipulation operates on a different structure. It is not a countdown to an inevitable collision, but a formal commitment not to sue Robinhood during the pendency of a state-court case whose outcome will determine the likelihood of any future collision. Nor did the district court's holding rest on the stipulations alone: it also rested on the fact that, even after the state-court proceedings are resolved, the likelihood of an enforcement action against Robinhood is

24

uncertain at best. Add. 4-6; *see supra*, at 16-18.[5]

*Second*, Robinhood observes (Br. 38) that it is not a party to the state-court proceedings against Kalshi and so cannot be bound by any judgment in that case. But preclusion principles are beside the point. The district court did not base its ripeness analysis on the *preclusive* effect of the Kalshi state-court proceedings; it based its analysis on the *practical* effect of those proceedings. As the district court explained, the outcome of the Kalshi proceedings will affect whether Robinhood ever faces the prospect of an enforcement suit. *See* Add. 4-5. Accounting for that practical reality is consistent with blackletter ripeness doctrine, which asks "whether the facts alleged, under *all* the circumstances, show that there is a substantial controversy . . . of sufficient immediacy and reality" to warrant adjudication. *Healey*, 844 F.3d at 326 (emphasis added). Courts answer that question based on the facts as they are, not through the formal lens of res judicata.

*Third*, Robinhood contends (Br. 40-42) that the district court "essentially abstained" and that its ruling invites forum-shopping by

---

[5]  Robinhood's reliance (Br. 36) on the principle that a claim is justiciable where "the only thing standing in the way" of prosecution "is the State's litigation position" fails for the same reason. The contingency here is not the Commonwealth's litigation position, but the outcome of the pending state-court proceedings and the Commonwealth's future, undetermined enforcement decisions.

25

stipulation. But the premise of Robinhood's argument is wrong. The district court did not decline to hear a case in deference to a state court; it found no ripe case to hear (and expressly declined to reach the Commonwealth's abstention arguments). Add. 2 n.1. Nor did the district court treat the pendency of the Kalshi proceedings as a "bar" to federal jurisdiction (*see* Appellant's Br. 39-40); instead, it simply found that this real-world fact bears on whether the injury Robinhood fears is imminent. Federal courts routinely consult real-world circumstances—including other proceedings—in assessing immediacy. Doing so is not abstention, but the ripeness analysis that Article III requires.

The language of the Commonwealth's stipulations does not change that conclusion. Robinhood notes (Br. 41) that the Commonwealth invoked "judicial economy" in entering its stipulations. *See* J.A. 30 (¶ 4); J.A. 153 (¶ 7). But the district court's decision rested on the speculative and contingent nature of Robinhood's feared injury, not on efficiency considerations. At bottom, Robinhood had the burden to show that a claim arising out of its facilitation of Kalshi trades is ripe. *See Reddy*, 845 F.3d at 501. It failed to do so.

**B.    Robinhood's unsubstantiated Rothera plans do not make its claim ripe.**

Seeking another hook for its claim, Robinhood argues (Br. 12-13, 38-39) that this action is ripe because it plans to offer contracts through

26

Rothera, an exchange in which its parent company holds a minority interest. Those assertions do not change the ripeness analysis.

1.    Allegations about Rothera entered this lawsuit as an afterthought. Robinhood's original complaint did not mention either Rothera or the joint venture that supposedly links Rothera to Robinhood's parent company. Robinhood's amended complaint was similarly silent. Instead, discussion of Rothera appeared for the first time in a declaration that Robinhood submitted in opposition to the Commonwealth's renewed motion to dismiss. Even then, the most that declaration could muster was three conclusory averments. First, the declaration stated that Robinhood's parent company owns a 45% stake in Rothera. J.A. 162 (¶ 6). Second, the declaration represented that "Robinhood plans to offer sports-related event contracts through Rothera's DCM and anticipates that once its partnership with Rothera is launched, a significant portion of its event contract volume will be redirected to Rothera." *Id.* (¶ 7). And third, the declaration stated that "Robinhood is targeting launching event contracts trading on Rothera by June 2026." *Id.* (¶ 8). *See also* Appellant's Br. 13 n. 7 (citing an April 2026 press release that repeats some of these assertions).

That is not the stuff of a ripe claim. The declaration describes intention, not conduct—contracts Robinhood "plans" to offer, a launch it is

27

"targeting." *Id.* (¶¶ 7-8). Despite ample opportunity to do so, Robinhood has supplied no evidence of contracts it has actually listed, trades it has actually executed, or other products it has actually offered to any Massachusetts customer through Rothera. Even now, Robinhood's appellate brief reaches outside the record—to an April 2026 earnings-call transcript, *see* Appellant's Br. 13 n. 7—to supplement its threadbare allegations. That is insufficient. A plaintiff bears the burden of demonstrating ripeness, and the types of vague assertions cannot carry that burden. *See Reddy*, 845 F.3d at 505 (holding that a claim was unripe where the triggering event's "establishment and contours" were "highly uncertain").[6]

Robinhood's arguments about Rothera also elide distinctions between corporate entities. Robinhood's declaration states that "Robinhood Markets, Inc. ('Robinhood Markets') formed a joint venture with Susquehanna International Group," and that the "joint venture (in which Robinhood Markets owns 50%)" subsequently "acquire[d] 90% of the equity in Rothera." J.A. 162 (¶ 6). But Robinhood Markets is not a party to this

---

[6] Robinhood's experience with ForecastEx underscores why such vague assertions are insufficient. As discussed above, that company stopped offering sports-related event contracts just a few months after its partnership with Robinhood began. J.A. 77-78 (¶ 27); J.A. 162 (¶ 6). As this experience demonstrates, business plans in this industry shift quickly, which is precisely why amorphous intentions and vague plans cannot substitute for concrete conduct in the ripeness analysis.

action; the plaintiff is Robinhood Derivatives, LLC. And Robinhood's declaration does not establish that *that* entity—the only plaintiff in this lawsuit—holds any interest of its own in Rothera. A corporate parent's investment activities do not automatically make an enforcement action against its subsidiary imminent, much less inevitable.

2.     Robinhood offers two rejoinders—one substantive, the other procedural. Neither is persuasive.

Substantively, Robinhood argues that "concrete plans to engage immediately (or nearly so) in an arguably proscribed activity" suffice to establish ripeness. Br. 27, 38 (quoting *Whitehouse*, 199 F.3d at 33). But *Whitehouse*'s formulation describes when a plaintiff's intended conduct is definite enough that the government's established legal position creates a live collision; it does not dispense with the requirement that the threatened enforcement itself be non-contingent. *See supra*, at 20. The Rothera averments fail on both ends. As just discussed, Robinhood's Rothera-related "plans" are prospective and undefined. And the injury it fears—a future enforcement suit—rests on conjecture about how the Commonwealth would react to a hypothetical future offering atop the contingencies the district court identified. Add. 4.

Procedurally, Robinhood argues (Br. 4, 22) that the district court "completely overlooked" its Rothera-related plans. As an initial matter,

29

that accusation ignores the fact that Robinhood itself treated Rothera as an afterthought below. *See supra*, at 27 (explaining that Robinhood failed to mention Rothera in either complaint and offered only three conclusory assertions in a later declaration). The district court did not need to provide a point-by-point refutation of every assertion tucked away in Robinhood's submissions. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990 (1st Cir. 1988) (cautioning that a litigant must "spell out its arguments squarely and distinctly"); *cf. United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that a point "adverted to in a perfunctory manner" commands no extended judicial reply). Regardless, the district court did not overlook anything. The court granted reconsideration precisely so Robinhood could plead its expanded operations; the court then accepted the amended complaint and supporting declaration and concluded, correctly, that the conduct that Robinhood was then engaging in remained unchanged from its original complaint. Add. 6.

3.　For all the foregoing reasons, the district court's ripeness determination was correct, and this Court should affirm the judgment below. But even if the Court were to believe that there have been material factual developments since judgment entered, Robinhood still would not be entitled to the relief it seeks (outright reversal with instructions that

30

the district court proceed straight to the merits, *see* Br. 4).  When confronted with the possibility of a "fundamental change in the facts of the case since the appeal was first filed and briefed," this Court has explained, "the appropriate course of action is to remand to the district court for reconsideration of its ripeness ruling in light of the changed circumstances."  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 953 F.3d 154, 158 (1st Cir. 2020).  Accordingly, even if Robinhood could come forward with new facts now, the most it is entitled to is a remand.

## II.    In the alternative, the sole claim that Robinhood asserts in this action fails as a matter of law.

Even if the Court were to deem Robinhood's claim ripe, it should still affirm the district court's dismissal.  Robinhood's single-count complaint does not invoke any recognized cause of action; instead, Robinhood purported to sue directly under the Supremacy Clause.  J.A. 25-26, 96-98.  But controlling precedent is clear: the Supremacy Clause "is not the source of any federal rights," and it "certainly does not create a cause of action."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-325 (2015) (quotation marks omitted) (explaining that the Clause, which merely "creates a rule of decision," is "silent regarding who may enforce federal laws in court, and in what circumstances they may do so").[7]

---

[7]    In its briefing below, Robinhood argued that "*Armstrong* is inapposite

To survive dismissal, therefore, Robinhood must recharacterize its Supremacy Clause claim to try to fit it within some other recognized cause of action. In its briefing below, Robinhood pivoted to the equitable cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908). According to Robinhood, *Young* gives it a "right of action" in this case because it "seeks declaratory and injunctive relief against state officers in their official capacities to enjoin them from enforcing" a preempted state law. D. Mass. Dkt. No. 62, at 1; *see id.* at 12-13. Robinhood's opening brief in this Court doubles down on that framing (at 2, 14).

But *Young* applies only in limited circumstances. In *Young* itself, the Supreme Court explained that federal courts may enjoin "officers of the state . . . who *threaten and are about to* commence proceedings [against the plaintiff] . . . to enforce . . . an unconstitutional act." 209 U.S. at 156 (emphasis added). More recently, in *Armstrong*, the Supreme Court reiterated that *Young* provides "relief against state officers who *are violating, or planning to violate*, federal law." 575 U.S. at 326 (emphasis added); *accord, e.g., Aroostook Band of Micmacs v. Ryan*, 404 F.3d

---

because Robinhood seeks a *prohibitory* injunction" as opposed to the *mandatory* injunction that the plaintiffs in *Armstrong* pursued. D. Mass. Dkt. No. 62, at 11-12. But nothing in *Armstrong*'s reasoning or its unequivocal statement that the Supremacy Clause "does not create a cause of action," 575 U.S. at 325, turned on that purported distinction.

48, 65 (1st Cir. 2005), *abrogated on other grounds by Narragansett Indian Tribe v. Rhode Island*, 449 F.3d 16 (1st Cir. 2006) ("We have recognized an imminence requirement in *Ex parte Young* actions . . . ."). Applying these principles, courts have routinely declined to allow plaintiffs to proceed under *Young* where there was no indication that the defendants were "threatening" or "planning" to enforce the challenged state law. For example, in *Minnesota RFL Republican Farmer Labor Caucus v. Freeman*, 33 F.4th 985 (8th Cir. 2022), the court held that *Young* did not apply where the defendants "averred that they ha[d] 'no present intention' to commence proceedings"—even though they "fail[ed] to disavow future prosecutions." *Id.* at 992; *see also, e.g.*, *Mi Familia Vota v. Ogg*, 105 F.4th 313, 331 (5th Cir. 2024); *Children's Healthcare Is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996).

These principles foreclose Robinhood's reliance on *Young*. As described above, Robinhood can point to no facts to suggest that the Commonwealth "threaten[ed] and [was] about to commence proceedings" against it under the state's allegedly preempted sports-wagering laws. *Young*, 209 U.S. at 159; *see supra*, at 8. To the contrary, the Commonwealth here stipulated to the nonenforcement of the challenged state laws against Robinhood during the pendency of the ongoing preliminary-injunction proceedings in the Kalshi litigation. J.A. 152-153. Robinhood

33

observes (Br. 37) that the Commonwealth's stipulation did not unequivocally disclaim its right to bring enforcement proceedings in the future. But as the Eighth Circuit explained in *Minnesota RFL*, that is not enough to trigger *Young*. *See* 33 F.4th at 992 (holding that *Young* did not apply even though the defendants "fail[ed] to disavow future prosecutions"). Or, as the Fifth Circuit has put it, "officials' attestations that they will not enforce a challenged statute while litigation over its constitutionality is ongoing sufficiently negates the charge of a demonstrated willingness to enforce" for *Young*'s purposes. *Mi Familia Vota*, 105 F.4th at 331.

For all these reasons, even if the Court were to deem Robinhood's claim ripe, it should affirm the judgment below because Robinhood has failed to assert a viable cause of action.[8]

---

[8]  Robinhood does not argue that the Declaratory Judgment Act (DJA) supplies a cause of action here. *See* D. Mass. Dkt. No. 62, at 14 (maintaining that this suit arises under *Ex parte Young* and "not . . . the DJA"). That is for good reason. As the Supreme Court has held, the DJA "enlarge[s] the range of remedies available," but it "d[oes] not extend [the] jurisdiction" of the federal courts and does not itself create a cause of action. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). Moreover, "[w]here the complaint in an action for declaratory judgment seeks in essence to assert a *defense* to an impending or threatened state court action, . . . it is doubtful if a federal court may entertain [the] action" if the impending state court action arises solely under state law. *Colonial Penn Grp., Inc. v. Colonial Deposit Co.*, 834 F.2d 229, 233 (1st Cir. 1987) (quoting *Public Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 248 (1952)) (emphasis added).

## CONCLUSION

The Court should affirm the district court's judgment.


July 20, 2026                                    Respectfully submitted.

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*

 /s/ *Gerard J. Cedrone*
M. PATRICK MOORE
  *First Assistant Attorney General*
LOUISA CASTRUCCI
GERARD J. CEDRONE
ALDA CHAN
FRANCES COHEN
JOSHUA R. EDLIN
JARED RINEHIMER
  *Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for Defendants*


35

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limits of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the document exempted by Rule 32(f), it contains 7,625 words.

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word in 14-point Century Schoolbook, a proportionally spaced typeface.

July 20, 2026                                  /s/ *Gerard J. Cedrone*